
FILED
APR 08 2025
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:25-CR-76

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | |
| QUEENSLY ONUZULIKE | ) | |

The United States Attorney charges that at all times relevant to this Criminal Information:

### A. THE MEDICAID PROGRAM

1. The North Carolina Medicaid program ("Medicaid") was a federal and state- funded health care program providing benefits to individuals, particularly children, and families who met specified financial and other eligibility requirements. Individuals who received benefits under Medicaid were referred to as Medicaid "recipients" or "beneficiaries." Medicaid covered the costs of certain medical services, products, and benefits, including prescription drug benefits, for Medicaid recipients.

2. The Center for Medicaid Services ("CMS"), within the federal Department of Health and Human Services, was responsible for overseeing the Medicaid program in participating states, including North Carolina. The North Carolina Department of Health and Human Services("DHHS"), Division of Health Benefits ("DHB"), has been

1

the administering state agency for the Medicaid Program in North Carolina since 1978. Claims are electronically filed by providers, processed, and paid through a system known as "NC Tracks."

3. In Medicaid a "provider" is defined as any individual or entity furnishing Medicaid services under a provider agreement with the Medicaid Agency (42 CFR § 400.203). For a provider to obtain reimbursement from Medicaid for providing services to a Medicaid recipient, the provider electronically submits the claim utilizing their National Provider Identifier ("NPI") number. Every provider who participates in Medicaid must apply for and be assigned a unique NPI number. The NPI is a unique identification number for covered health care providers.

4. The provider electronically submits claims to DHHS through the NC Tracks system. The provider selects the most specific billing code that accurately and completely describes the procedure, product or service provided. Typically, services are billed by a provider entering a diagnosis and billing code into the NC Tracks system. The claim generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the beneficiary, the nature of the service rendered, and the provider number or federally issued NPI number. DHHS relies upon the information contained on the claim submitted by the provider to pay the claim and reimburse the provider.

5. While Medicaid may reject a claim if, for example, the provider or beneficiary is not enrolled, Medicaid typically presumes the truth of each claim and

2

generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to submit claims only for services that they actually perform.

6. Medicaid providers sign participation agreements that state, in relevant part, that they will maintain and make available "complete and accurate medical records" in accordance with Medicaid regulations, which they must furnish to Medicaid authorities upon request.

7. Medicaid regulations and policies specify what constitutes "complete and accurate medical records" according to the services provided. Outpatient behavioral health providers are required to maintain written clinical assessments, treatment plans, and progress notes for each treatment encounter with a beneficiary. The records must be kept and maintained for a minimum of five years in order to document and substantiate any claims for reimbursement.

8. As an alternative to direct fee-for-service billing through NC Tracks, Medicaid also includes a managed care structure consisting of Prepaid Health Plans (PHPs). In Medicaid managed care, DHHS remains responsible for all aspects of NC Medicaid but delegates the direct management of certain health services, to include mental health services, to PHPs. The PHPs assume financial risk through capitated contracts and contract with providers to provide services for beneficiaries. Claims for these services are submitted directly to the PHP, as opposed to being submitted through NC Tracks, and are paid by and through the PHP. The claim generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the

3

beneficiary, the nature of the service rendered, and the provider number or federally issued NPI number.

9. Medicaid, including any claims paid directly or by and through a PHP, was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

### B. THE DEFENDANT, RELEVANT PERSONS, AND ENTITIES

10. Defendant QUEENSLY ONUZULIKE ("ONUZULIKE") was a Licensed Clinical Social Worker (LCSW) who was licensed with the State of North Carolina since September 19, 2019. ONUZULIKE was also licensed as a clinical social worker associate, becoming licensed on June 2, 2017, with the State of North Carolina. ONUZULIKE first enrolled as a Medicaid provider through the NC Tracks system on or about August 6, 2017. Through her enrollment agreement as a Medicaid provider, ONUZULIKE expressly agreed in relevant part, that she would maintain and make available "complete and accurate records" in accordance with Medicaid regulations.

11. Our Treatment Center ("OTC") is a North Carolina corporation formed on November 24, 2009, in the Eastern District of North Carolina. T.K. was its organizer and only listed member. OTC has been a Medicaid provider with NC Medicaid since July 20, 2011. During times material to this Criminal Information, OTC billed Medicaid almost exclusively for psychotherapy services and related evaluations.

12. Partners Against Sexually Transmitted Diseases ("Partners") is a North Carolina non-profit corporation formed on March 31, 2005, in the Eastern District of

4

North Carolina. W.K., the husband of T.K., is its organizer and is the President of the corporation as of July 10, 2019. Partners has been a Medicaid provider with NC Medicaid since July 7, 2019. During times material to this Criminal Information, Partners billed Medicaid almost exclusively for psychotherapy and related evaluations.

13. ONUZULIKE was employed as a LCSW at OTC and Partners and purported to provide outpatient behavioral health services, primarily psychotherapy, to Medicaid beneficiaries at various locations in the Eastern District of North Carolina.

14. At all times relevant to this Information, ONUZULIKE resided in the Eastern District of North Carolina.

15. Between January 2017 and June 2023, OTC and Partners targeted refugees residing in the Eastern District of North Carolina and elsewhere to become clients of OTC and Partners.

16. The refugees approached by OTC and Partners were often indigent and in need of various forms of time-consuming assistance to maintain daily social welfare in the United States. By way of example, and not by way of limitation, the refugees often needed assistance with reading and understanding mail; understanding the American legal system; assistance with English as a second language; transportation to grocery stores, the Division of Motor Vehicles, and other appointments. Such forms of social assistance, collectively referred to herein as "social needs" did not constitute "psychotherapy" within the Medicaid program.

17. T.K., ONUZULIKE, and others working for T.K., were tasked to locate and

5

meet with refugees for the purposes of soliciting their patronage with OTC and Partners. Despite OTC and Partners principally billing Medicaid for psychotherapy and related services, T.K., ONUZULIKE, and others, primarily enticed refugees to sign up with OTC and Partners based upon offers of assistance with social needs. Despite the fact that Medicaid would not compensate OTC or Partners for time spent attending to the social needs of the refugees, T.K., ONUZULIKE, and others, collected Medicaid Identification Numbers and other personally identifiable information ("PII") from the refugees. Often, T.K., ONUZULIKE, and others, would collect Medicaid information for all members of a household. This information was then later utilized by OTC and Partners to bill Medicaid exclusively for psychotherapy and related evaluations.

18. T.K. did not compensate employees of OTC and Partners for the full amount of time that they spent attending to the social needs of the refugees. Instead, T.K. would only compensate therapists in the form of a percentage of each hour of psychotherapy services that they purported to provide to the refugees. Since Medicaid authorized payment for no more than an hour of psychotherapy services to one person on any given day, this often resulted in ONUZULIKE and others working for several hours in a day tending to the social needs of the refugees, without the ability to be lawfully compensated for their time. Nevertheless, T.K. demanded of employees that they continue to attend to all of the social needs of the refugee client population.

19. To account for this shortfall, T.K., ONUZULIKE, and other therapists working for T.K., created materially false documentation to account for the time that

6

they spent servicing the social needs of the refugee clients. By way of example, four hours spent assisting a refugee with social needs on one day would be billed to Medicaid and documented in clinical psychotherapy notes as four separate one-hour psychotherapy sessions, spread across four days; even though such psychotherapy did not occur as documented and billed. In another example, time spent with one member of a refugee family on a given day would be billed to Medicaid and documented in clinical psychotherapy notes as time spent conducting separate psychotherapy sessions with multiple family members in the same household, across multiple dates; even though such psychotherapy did not occur as documented and billed.

20. Likewise, the clinical therapy notes drafted by T.K., ONUZULIKE, and others, did not truly reflect the specific interactions and occurrences that occurred with a given refugee client on a given day. T.K., ONUZULIKE, and others, excluded from the clinical psychotherapy notes information about the social services that were provided to the refugee clients. Instead, T.K., ONUZULIKE, and others only included language in the notes that made it appear as though a one-hour psychotherapy session had occurred, including notations regarding progress toward psychotherapy-related goals and outcomes based upon interactions during the session.

21. Based upon the billing and documentation practices described above, significant quantities of clinical psychotherapy notes drafted by T.K., ONUZULIKE, and others, were false. By way of example, and not by way of limitation, in some instances, ONUZULIKE drafted clinical psychotherapy notes during a specific time period when

7

she was allegedly in the midst of a psychotherapy session with another alleged client.

22. After billing Medicaid either through NC Tracks or PHPs, including but not limited to Carolina Complete Health, WellCare, and Healthy Blue dba Blue Cross Blue Shield of NC, in accordance with the scheme described above, T.K. received payment from Medicaid for millions of dollars in alleged psychotherapy services allegedly rendered by ONUZULIKE and other therpaists, even though the documentation to support such services was often false. T.K. retained a portion of the Medicaid reimbursements for such billed services, and paid the therapists a percentage of each hour of psychotherapy billed in their names.

## THE CHARGE

23. Beginning at a time unknown, but no later than January 2017, and continuing to a time unknown, but no earlier than June 2023, in the Eastern District of North Carolina and elsewhere, QUEENSLY ONUZULIKE, and others known and unknown to the United States Attorney, conspired, confederated, and agreed, in a matter involving a health care benefit program, to knowingly and willfully make and use materially false writings and documents, specifically, clinical documentation purporting to justify billed psychotherapy services, knowing the same to contain materially false, fictitious, or fraudulent statements, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1035(a)(2).

## OBJECT OF THE CONSPIRACY

24. It was the object of the conspiracy to financially benefit from drafting and maintaining false clinical psychotherapy documentation to support and justify billings to Medicaid for psychotherapy services.

## MANNER AND MEANS

25. Paragraphs 1 through 22 are incorporated by reference as though fully set forth in this Count.

## OVERT ACTS

26. In furtherance of the conspiracy, and to achieve the objects thereof, a member of the conspiracy committed and caused to be committed the following overt acts, among others, in the Eastern District of North Carolina and elsewhere:

   a. A member of the conspiracy acquired a Medicaid Identification Number from a refugee.

   b. A member of the conspiracy transmitted a patient name and alleged date of psychotherapy services to another member of the conspiracy for the purposes of billing Medicaid.

   c. A member of the conspiracy billed Medicaid for a psychotherapy service.

   d. A member of the conspiracy drafted a clinical psychotherapy note that did not accurately reflect what occurred on the billed date of service.

   e. A member of the conspiracy maintained the false clinical psychotherapy

note within OTC and Partners records for later review by Medicaid.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any Federal health care offense as defined in 18 U.S.C. § 24(a), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offense.

The forfeitable property includes, but is not limited to, the following:

<u>Forfeiture Money Judgment:</u>

a) A sum of money representing the gross proceeds personally obtained by the defendant.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable

10

property described above.

DANIEL P. BUBAR
Acting United States Attorney

*/s/ Tasha C. Gardner*

BY: TASHA C. GARDNER
Special Assistant United States Attorney

11